## Rounds, et al. v. Rounds.

(Decided May 4, 1926.)

### Appeal from Daviess Circuit Court.

1. Wills.—Questions of mental incapacity, undue influence, fraud, etc., in will contest, are for jury, where evidence is conflicting.

2. Wills.—In will contest evidence of mental incapacity and undue influence held sufficient to take case to jury and sustain verdict for contestant.

3. Wills—Instruction Held Not Erroneous in Authorizing Finding Against Will if Obtained by Undue Influence, though One of Beneficiaries was Not Shown to have Exercised Such Influence.—Instruction held not erroneous in authorizing finding against will if obtained by undue influence, though evidence showed no such influence by one of beneficiaries, as undue influence invalidating will may be that of any one of beneficiaries or of third person.

C. W. WELLS and LOUIS I. IGLEHEART for appellants.

BEN D. RINGO and FLOYD J. LASWELL for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Elizabeth M. Rounds died January 12, 1924, aged 89 years. Her only heirs at law were her five children, Fred, Harry, James, Erdix and Frank, and two grandchildren, Sherley J. Rounds, the son of a deceased son, and Roy Silverthorn, the son of a deceased daughter. By her will, which was executed on June 30, 1920, she confirmed two deeds whereby she conveyed to her sons, Fred V. Rounds and Harry B. Rounds, two tracts of land on the Leitchfield road southeast of Owensboro, one containing 36 acres and the other 6 1/3 acres, and a third tract containing 3 34/100 acres located on Griffith avenue in Owensboro. She also confirmed a certain contract by which in consideration of $2,500.00 to be paid she sold and transferred to Fred and Harry all of her interest in the firm of B. H. Rounds & Sons, and all of her personal property of every kind and description. She also devised and bequeathed all of her property of every kind and description to Fred and Harry, with the proviso that if any part of the $2,500.00 for which the business was sold was not paid before her death then the balance should go to her other three sons and grandsons, James, Erdix, Frank, Sherley and Roy Silverthorn. She added that with this exception she desired her two sons Fred and Harry to have all of her property, including that transferred to

them by the deeds and contracts, assigning as a reason that for more than thirteen years they had looked after, provided for and taken care of her in a very kind and attentive way, and that the care, attention and provision which they had made for her were worth more than all the property devised to them. In case an executor was necessary she nominated Fred and Harry, and asked the court to appoint them or either of them without requiring any bond.

Sherley J. Rounds, the grandson of the testatrix, contested the will on the ground of mental incapacity and undue influence. The jury found against the will and the propounders have appealed.

The will was witnessed and proven by Dr. C. J. Lockhart and E. E. Owsley. Dr. Lockhart deposed that he thought that the mind of the testatrix was in a normal condition at the time. Some few weeks before he had treated her for pneumonia. On the occasion when he attested the will Fred Rounds asked him to come down. It was about eight o'clock in the evening. Mr. Owsley went along. Mrs. Rounds said, ''I want you to witness my will.'' The will was not read at the time. Whether she knew anything about business matters he did not know. He had no occasion to test out the question. Mrs. Rounds lived in a small room back of the store and it was not well lighted or ventilated. E. E. Owsley testified that Mrs. Rounds' mind was all right so far as he knew, or he would not have witnessed the will. Her talk was normal and rational. By appointment with Fred he met Dr. Lockhart there to witness the will. Mrs. Rounds said that she wanted him to witness the will and that was all that was said about it. He had never talked to her about her business affairs.

The contestant, Sherley J. Rounds, testified that he saw his grandmother every day for about a month in 1922. At that time his uncle Fred occupied the bed with her and would hardly ever leave her alone. In his opinion she had no mind at all. While he was reading to her she paid no attention whatever. She would sit there and pick at her clothes, or tear a paper into small scraps. If she had a napkin or handkerchief she would sit and fold it in small squares and make designs out of it just as a little child would do. She did not know him at all, and when her sons came in she would ask who that was. The room which his grandmother occupied was about 24 by 20. It was necessary to use an electric light to read by.

Fred was the dominating influence in his grandmother's life, and the only influence she would consider. She did what he told her to do. Sometimes it took coaxing and sometimes it took a little more than coaxing. On cross-examination it developed that prior to the year 1922 he had not seen his grandmother for 16 years. He expressed the opinion that from her condition in 1922 he did not believe that she could have gotten into such condition in less than five years. Erdix N. Rounds, who sometimes worked in the store on a commission basis, testified that even as far back as 1914 or 1915 his mother asked who the children were and asked who his wife was. In 1919 when he came back his mother got them all mixed up and lots of times would take him for Fred and on other occasions would think Fred was her husband. At that time she did not realize that her husband was dead. Lots of times she would say, "Daddy has not come to supper." His brother Fred had an influence over his mother and whatever he demanded or wanted went. Fred was in the horse business and that worried his mother. She said, "He is breaking us up." She also said that his mind was unbalanced and on that account there was no love equal to a mother's love and she hung to him. Long after the will was executed she said that she had made no will and wanted all of them to share equally. Fred always nursed his mother and was very attentive to her. James Rounds testified that his mother never had any ill feeling towards any of the boys. He frequently talked with his mother. Her hobby was to have the children home. She would frequently say, "I wish you would go bring the children home, it is getting late." He would tell her that he had been after the children and that they were all right. She would then become reconciled and go to bed. After he had helped her to bed she would ask him if he had gone after the children. He told her that the children were at a neighbor's and were all right. She would then ask when they were going to have supper. She would sit down and eat a meal and immediately after leaving the table would say, "When are you going to give me my supper, I am getting hungry." He could not say that she had a good mind. She could tell you all about her girlhood days, but knew nothing about things that had happened since then. Half the time she did not know her own children. Sometimes she would call Fred "Daddy" and say, "Is Daddy down at his store yet?" In 1920 his mother did not have mind enough to know her property

or her children. She was never unkind to any of the children. She always listened to Fred and did what he wanted her to do. Frank Rounds saw his mother two or three times a week. From 1916 down his mother did not know him unless he told her who he was. Her mind grew worse. He often heard her say to Jim, "When are you going to bring the children home?" He wanted to know who the children were and then she wanted to know who he was. She never knew at any time what she was doing. She often called Fred "Daddy" and he believed she thought Fred was witness' father. Byrne McDaniel testified that he knew Mrs. Rounds as far back as 1902 and saw her two or three times a year during the last ten years of her life. When he first got acquainted with her she knew him and talked to him. During the last six or seven years she did not act like she recognized him at all. Margaret Rounds Iaun, a daughter of Frank Rounds, testified that in 1918 she saw her grandmother nearly every day. In 1920 and 1921 she saw her three or four times a week. She spent a lot of time in the room with her grandmother. She never knew her father or her Uncle Jim or her Uncle Dick. Her Uncle Fred directed everything that should be done about the house. Her grandmother did what he told her to do. At that time her grandmother did not know what property she had. She would ask who people were and after a while ask again who they were. John Y. Brown deposed that Ed Rounds married his sister. He was in Owensboro and visted the Rounds' place of business in May, 1918. He went back and spoke to Mrs. Rounds, who was sitting in a rocking chair. She never recognized him. Fred said, "This is Adalia's brother." When he went to leave Fred said, "I would like to have you stay to dinner with us, but, owing to the condition mother is in, we can't very well." He further stated that his mother was not just like she ought to be in her mind. Mrs. Ora Hardy testified that she nursed Mrs. Rounds in 1922. At that time Mrs. Rounds called Fred "Daddy." Witness supposed she thought he was her husband. At that time her mind was just like a baby's. She often referred to her children as little. On one occasion she said, "This is Mr. Jim, don't you know him?" She said, "No, that ain't my son, he ought to be little around my feet." She also made the same remark about Mr. Frank. As long as she stayed there Mrs. Rounds was not capable of making a will. She did not know anything about her condition two years previous. While she

was there Mrs. Rounds had to be waited on like a child. Mrs. Sadie Quigley talked to Mrs. Rounds during the years 1917, 1918, 1919 and 1920. At that time Mrs. Rounds did not seem to know her and it was not pleasant to talk to her. Her mind was not clear. Fred was her mainstay and she would do whatever he said.

On the other hand Fred Rounds testified that his mother was a great invalid and that for the last ten years of her life he devoted the greater portion of his time to her. If he happened to be absent Harry waited on her. He never dominated his mother, but took care of her. His mother said, "I want to make my will." She told him what to put on the memorandum and he carried it to Mr. Wells, who wrote the will. At the time it was executed his mother's mind was good, and was invariably good except when she had a long sick spell. He never attempted to influence his mother in any way. The will represented exactly what she told him to put in it. On cross-examination he stated that after the will was drawn he took it up to the house and sent for Dr. Lockhart and Mr. Owsley to witness it. He maintained a car for his mother and took her driving every day. Harry Rounds said that his mother told him on one occasion to go and make a will. He said, "Go on, mother, you have nothing to will. You have already deeded us the property." She said, "I am going to make a will anyway." In 1920 and 1921 her mind was perfectly normal. The only time that she ever failed to know him was when she was right sick and had been unconscious for a few days. As soon as she regained consciousness she would call him by name. Ninety per cent. of Fred's time was taken up the last five years waiting on his mother. Dr. A. McKinney treated Mrs. Rounds during the year 1921. She was then suffering from hemorrhoids and other diseases that were very aggravating. One of the diseases was procidentia. At that time she could get all around and was pert as a cricket. While they had no extensive conversation her answers, questions and remarks were remarkable for one of her age. When Mrs. Rounds came to his office Fred always accompanied her. Mrs. Rounds' condition had existed for some time and would have a tendency to react on a woman's nervous system. However, he noticed no effect on Mrs. Rounds so far as mentality was concerned. Mayo Loeb, a traveling salesman who frequently visited the store, deposed that he saw Mrs. Rounds in the year 1920 and her mind at that time was normal. At no time had

she ever failed to remember him. One time when they were out driving she pointed to a piece of property and said, "This is Fred's." Sometimes they accompanied him to dinner at the hotel. On these occasions Mrs. Rounds talked intelligently and he never saw anything wrong with her mind. In addition to these witnesses, twelve others, who knew Mrs. Rounds and saw her now and then, testified that she was a woman of intelligence and that her mind was all right about the time the will was written.

Appellants insist that the court should have directed the jury to sustain the will. The argument is that there is no evidence of undue influence, that the facts relied on by the nonexpert witnesses to show mental incapacity were not sufficient for that purpose, and that in disposing of her estate testatrix did the natural thing and rewarded those who had never faltered in their care and devotion. If the question were for the court, it might be that we would be inclined to hold that the evidence preponderated in favor of the will, but under our practice questions of mental incapacity, undue influence, fraud and the like are for the jury where the evidence is conflicting. Though there is strong evidence to the contrary, the case presented by the evidence for contestant may be summarized as follows: The testatrix was 85 years of age when the will was executed. For some time prior thereto she suffered from hemorrhoids and procidentia. Her condition was such that she required constant attention. For the most part this service was performed by Fred, who slept with his mother and changed the cloths throughout the night. When he was not there Harry took his place. Prior to the execution of the will she had executed the deeds and contract referred to in the will. So far as the record shows the attorney who drew the will did not confer with the testatrix. Though he says that his mother told him what to put on the memorandum Fred prepared the memorandum and took it to the attorney. The attorney prepared the will and delivered it to Fred, who made appointments with the attesting witnesses to come to the store and witness the will. Several witnesses testified that he was the dominating influence in the household and that his mother was inclined to do whatever he said. There was also evidence that she thought without any reason therefor that his mind was unbalanced and wanted to stand by him on that account.

In addition to this it appears that Mrs. Rounds did not know her own children and now and then mistook one for the other. There was evidence from which it would be inferred that she thought her husband was still living. Immediately after leaving the table she would state that she was hungry and inquire when she was going to get her supper. Looking at the case in the light of these and other facts which might be mentioned we are constrained to hold that the evidence of mental incapacity and undue influence was sufficient to take the case to the jury and sustain the verdict.

On behalf of Harry Rounds it is insisted that the instruction on undue influence is erroneous in that it authorized a finding against the will if it was obtained by undue influence, regardless of the fact that the evidence failed to show that he exercised any undue influence over his mother. This contention is without merit. In a case of this kind the issue is will or no will, and the undue influence that would invalidate a will may be that of any one of the beneficiaries, or of a third person. Dean, etc. v. Phillips, 61 S. W. 10; 28 R. C. L. 142.

Judgment affirmed.