## Hanna et al. v. Eiche et al.

(Decided Dec. 21, 1934.)

(As Modified March 19, 1935.)

DYSARD, TINSLEY & PRICHARD for appellant.

J. D. ATKINSON, A. V. POLLOCK and BROWNING & DAVIS for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming in part and reversing in part.

Carrie Pfaff, a citizen and resident of Greenup, Greenup county, Ky., died testate on the 22d day of August, 1932. Her will was duly probated by the Greenup county court on the 5th day of September, 1932, from which order of probation an appeal was taken to the Greenup circuit court by the heirs at law of the testatrix, who are the appellees herein. Frances Hanna, one of the appellants herein, was named executrix of the will, but, being a nonresident of the state (residing in Portsmouth, Ohio), she was disqualified to act as such executrix, and Kendall G. Seaton was appointed administrator of the estate of the deceased, the testatrix.

The petition alleged:

"That said paper is not the last will and testament of the said Carrie Pfaff, for the reason that said Carrie Pfaff, at the time said paper is dated, and was executed, and for a long time prior thereto, was not of sound mind and memory, but by reason of age, illness and physical and mental infirmities, was mentally incapacitated from making a will, and did not at said time have such mental capacity as to enable her to know the objects of her bounty

and her duty to them, or the character or value of her estate, or to make a rational survey of her estate, or to dispose of it according to a fixed purpose of her own; that said Carrie Pfaff was persuaded and coerced into signing said paper by the undue influence of the appellees and defendants, Frances Hanna and Dr. Raymond Hanna, her husband, and others conspiring with them, and by the false, fraudulent and collusive representations and coercive conduct and acts of said Frances Hanna and Dr. Raymond Hanna of undue influence over the mind of the said Carrie Pfaff, so that said writing does not, because of such undue influence speak her wish or will.''

The case was tried before a jury, and resulted in a verdict finding the paper offered as the last will and testament of Carrie Pfaff not to be her last will and testament, but that it was obtained by undue influence. From a judgment in accordance with that verdict, this appeal is prosecuted.

The will is in the handwriting of appellant, Mrs. Hanna, and she said that she wrote it without any assistance. She said she acquired her legal knowledge from her experience as a stenographer in law offices, and she also had training as secretary to a newspaper publishing company.

The will itself bespeaks legal knowledge and intelligence, and fairly warrants the inference that Mrs. Hanna is a woman of above average intelligence and business knowledge. In the peculiar circumstances, an examination of the will as a whole may be of importance; hence we here copy the will in full:

''In the name of the Benevolent Father of All: I, Carrie Pfaff, being of sound and disposing mind and memory, do hereby make, and declare this my last will and testament.

''Item One: I direct that my just debts and funeral expenses be paid as soon as possible.

''Item Two: I give and bequeath to Miss Barbara Eiche, my second cousin, of 199 Second Street, Hartford, Wisconsin, the sum of Two Hundred Dollars ($200.00).

''Item Three: I give and bequeath to James Kinner, Greenup, Kentucky the sum of Two Hundred Dollars ($200.00).

"Item Four: I give and bequeath to Irwin Kinner, Greenup, Kentucky, the sum of Two Hundred Dollars ($200.00).

"Item Five: I give and bequeath to Elizabeth Kinner, Greenup, Kentucky, the sum of Twenty Five Dollars ($25.00), my gold necklace, oval table & cover, wicker settee and rocker, mantel clock & picture, all of which are in the living room; six (6) cane seated chairs, worsted quilt (box pattern) and quilt made of small calico pieces.

"Item Six: I bequeath to Caroline Kinner, the sum of Twenty five Dollars ($25.00) and ladies watch.

"Item Seven: I bequeath to Paul Lester Kinner, the sum of twenty five Dollars ($25.00).

"Item Eight: I bequeath to Emma George, the sum of Six Hundred Dollars ($600.00); dresser and square oak stand in front bed room; cupboard in kitchen (with glass doors) plush coat with light fur collar; figured silk dress trimmed in red; sewing machine; rug in living room; silk quilt with green silk for lining and a ladies watch.

"Item Nine: I bequeath to Mr. George, Sr., Greenup, Ky., mahogany rocker, in front bed room.

"Item Ten: I bequeath to Mary Agnes Hanna, Portsmouth, Ohio, bureau in back bed room.

"Item Eleven: I bequeath to Julia Lee Hanna, Portsmouth, Ohio, my brown coat, scarves and hat and kitchen chairs.

"Item Twelve: I bequeath to Lizzie Smith, of Greenup, Kentucky, the sum of Fifty Dollars ($50.00).

"Item Thirteen: I bequeath to Sallie Winter, Greenup, Ky., the sum of Fifty Dollars ($50.00).

"Item Fourteen: I bequeath to John Hanna, of Portsmouth, Ohio, trunk in back bed room and my brother's watch, I desire that the watch be given him upon his graduation from high school.

"Item Fifteen: I bequeath to Mrs. Anna Keenan, the sum of Three Hundred Dollars and money derived from the sale of the fixtures located in store buildings now occupied by Mr. Joe George, this bequest is with the understanding that Mrs.

Keenan, deed back to my estate the property known as the Compliment property located in Haverhill, Ohio, this property is my property and should it be necessary for my Executrix to sue Mrs. Keenan to establish the ownership then the above gift of Three Hundred Dollars and other bequest, shall be null and void and shall become a part of my estate.

"Item Sixteen: I bequeath to Mr. Davisson, Haverhill, Ohio, the sum of Five Hundred Dollars ($500.00), and any tools about the place he may want.

"Item Seventeen: I bequeath to Dr. Raymond Hanna, Portsmouth, Ohio, the bed in the front bed room.

"Item Eighteen: I bequeath to Mrs. Frances Hanna, Portsmouth, Ohio, Household effects not otherwise mentioned.

"Item Nineteen: Lester Lynn, Russell, Ky., feather tick.

"Item Twenty: Mrs. Lester Lynn, Russell, Ky., the sum of Fifty Dollars ($50.00).

"Item Twenty-One: I hereby direct my executrix to have built for my final resting place and resting place of my father, mother, sister and brother, a mausoleum of granite to be situated in Woodland Cemetery, Ironton, Ohio, said mausoleum to cost around Ten Thousand Dollars ($10,-000.00) and contain six Crypts; 5 of which will be occupied by myself and family and the sixth at the disposal of Mrs. Frances Hanna, Portsmouth, Ohio, since some of my estate consists of real estate it may not be sold at once at par value. I direct that this mausoleum be built when in the judgment of the executrix, said real estate can be sold at a fair value. I further direct that for the upkeep of said mausoleum, the sum of Two Thousand Dollars ($2,000.00) be set aside in trust the interest of which is to be used for the perpetual care of said mausoleum. In the interval from the time of my death until the mausoleum is ready for the occupancy of our bodies, I direct that my remains be kept in the Community Mausoleum, Woodland Cemetery, Ironton, Ohio.

"Item Twenty-Two: From the residue of my estate I direct that Two Hundred Dollars ($200.00)

be used for Masses to be read for the repose of the soul of myself and family. Churches where masses are to be read to be designated by my executrix. Any balance remaining in my estate after the carrying out of the directions of my will, I direct that the same be paid to my good friend, Frances Hanna, who will carry out some personal matters which I have discussed with her during my life.

"Item Twenty-three: I hereby appoint Mrs. Frances Hanna, Portsmouth, Ohio, Executrix of this will and direct that no bond be required.

"In testimony whereof, I have hereunto set my hand and seal at Greenup, Kentucky, this second day of August, A. D., 1932.

"Carrie Pfaff."

Carrie Pfaff, the testatrix, to whom we will hereinafter refer as Miss Pfaff, was the daughter of a German immigrant. She had spent her entire life in the home at Greenup which her father had purchased in 1868. She was never married. After the death of her parents, the family consisted of a brother, Christian, and a sister, Mary, both unmarried. The brother and sister died a number of years prior to the death of Miss Pfaff. Miss Pfaff was a woman of very meager education, and lived a very secluded life, seldom visiting any one, and had very few intimate acquaintances, and but little interest in people or anything outside her own home.

It appears that the acquaintance of Miss Pfaff with the Hannas began as a result of osteopathic treatments by Dr. Hanna of Miss Pfaff's brother, Christian, who died about 1928. After the death of Miss Pfaff's brother, the friendship between the Hannas and Miss Pfaff continued. However, Mrs. Hanna testified that prior to April, 1932, she was never in Miss Pfaff's home more than a few hours, and that Miss Pfaff made only one visit to the Hanna home. At that time (March, 1932) Miss Pfaff was in failing health, and it appears that her illness began in the fall previous, 1931. It developed that she had cancer of the stomach from which she died August 22, 1932, at the home of the Hannas in Portsmouth, Ohio. The will was executed August 2, 1932, 20 days prior to her death. The doctor who performed an autopsy following her death found

that the cancerous condition had existed for a year or longer. It appears that in the month of March, 1932, the appellant Dr. Hanna, who was treating Miss Pfaff, had an X-ray made of her, but what was disclosed by the X-ray, if anything, is unknown so far as the record discloses.

It is insisted for appellee that, although they were unable to learn or prove by any positive evidence what knowledge, if any, the Hannas obtained from their treatment of Miss Pfaff, yet the circumstances warrant the inference that they learned that Miss Pfaff's condition was serious, and, anticipating her early death, they then began to plan to obtain from her her property.

It is insisted for appellants that there is no evidence of undue influence, or at least the evidence is insufficient to support the verdict. To determine the issue a summary of the evidence becomes necessary.

Mrs. Nannie Kinner testified in substance that she had lived in Greenup a near neighbor to Miss Pfaff for 20 years and was well acquainted with her. It appears that Mrs. Kinner was one among the few intimate associates of Miss Pfaff. She described Miss Pfaff as being a kind and lovely old lady, of very nervous and excitable disposition. She visited Mrs. Kinner probably two or three times a week, and Mrs. Kinner visited Miss Pfaff's home about as often. She stated that in October, 1931, Miss Pfaff's health began to fail. She complained of her food not agreeing with her, of vomiting and gas on her stomach and also a pain in her stomach; and her condition continued to grow worse through the winter. About the second week in April, 1932, she heard Miss Pfaff talking in the presence of Mrs. Anna Keenan about taking a trip down in the Bluegrass, and said she was going to see Mrs. Kinner's daughter, who was in school in Lexington, but she said nothing about going to Portsmouth. She stated that she had never heard Miss Pfaff talk about the Hannas, and she did not know that there was any acquaintance between them. Miss Pfaff disappeared from her home a day or two after the conversation with Mrs. Keenan about going to Lexington, and it was some time before she heard anything about her. Finally, some time late in the month of May she heard that Miss Pfaff was somewhere in Portsmouth. On the 31st day of May Mrs. Kinner and Ona Tibbits went to Portsmouth in an

effort to locate Miss Pfaff and found her at the home of the Hannas. At that time Miss Pfaff had been gone from Greenup about 6 weeks. She described her as being in a very weak, nervous, and bad condition. Mrs. Kinner returned to her home in Greenup, and within a few days went back to Portsmouth to see Miss Pfaff and found her condition growing worse. The next time she saw her was on the 19th day of July, when she had returned to her home in Greenup, and she was still in a weak condition, "but she seemed to be glad to be home in her own bed and have things done as she wanted." She next saw her on the 31st of July in her home in Greenup. This was on Sunday night before the will was made the following Tuesday, August 2. She relates what occurred there, using this language:

"I walked in and sat down on the side of the bed and she took my hand in her hand and held it, and I asked her how she was feeling, and I asked her if there was anything I could do for her; Mrs. Hanna was standing there at the foot of the bed and she spoke up and said if there was anything she wanted with me they would send for me.

"Q. Did she give Miss Carrie (Pfaff) a chance to answer? A. No, sir, Mrs. Hanna answered for her.

"Q. At any time did she say anything about the Hannas bothering her to go back to Portsmouth? A. She called them those people and said they were after her to go back to Portsmouth this morning, and I didn't know who she meant, I said what people and she said Dr. Hanna and his wife, that they had run up and they wanted her to do this and that."

She stated that Miss Pfaff said that she would have to go back to Portsmouth every Friday for treatment, and asked Mrs. Kinner to let her (Mrs. Kinner) son take her down to Portsmouth for treatment every Friday. She offered to pay for the gas and pay for the bridge toll, and Mrs. Kinner told her that would be all right and that they would talk about it, and, if she wanted to go to Portsmouth for treatment, she would see that she went. Mrs. Kinner was asked about Miss Pfaff's condition when she saw her at her home in Greenup on the 21st of July, and she described it thus:

"She was in a very weak condition, and was in

mind not at all like she had been; any one could look at her and see her mind was weakening along with her body, and she seemed to be dazed.''

Miss Pfaff went back to Portsmouth with the Hannas, but the witness did not know the exact day. Later Mrs. Kinner went to Portsmouth in company with Ona Tibbits and Emma George to see Miss Pfaff, and again found her at the Hanna home. This was the 6th day of August. She said that Miss Pfaff's condition was apparently growing worse. When they were leaving the Hanna home, Miss Tibbits stayed in the room several minutes with Miss Pfaff and talked to her, but she did not hear what was said. Mrs. Kinner was asked:

"From what you saw of Miss Carrie (Pfaff) on that occasion and from your observation of her and talking with her and seeing her as you did, state to the jury whether or not you are of the opinion that on August 2, Miss Carrie had mind enough to know her estate and its extent, know her relatives and next of kin and appreciate her obligation to them, and be able to dispose of her estate according to a fixed purpose of her own? A. I do not.''

On cross-examination Mrs. Kinner was asked about some bequest left to her daughter by Miss Pfaff's will, and the witness said that Miss Pfaff told her she wanted her daughter to have a table in her home; that she wanted her boys to have her brother's watch and a picture. She stated that Miss Pfaff told her a long while ago that she had slips of paper in the kitchen, and, when she would think of something around the home she wanted certain friends to have, she would write it down on the paper, but she did not mention or say what any of the items were nor name the friends to whom she intended to leave the bequests. She said that Miss Pfaff spoke of Miss Tibbits and Mae Schultz. She stated that a year or two after the death of Miss Pfaff's brother, Miss Pfaff talked to her about a mausoleum and said that she was looking about the different materials and prices, etc., and that "she had heard of a man in Ironton who had given her some prices and she didn't know but what she might build it.'' Miss Pfaff further stated to the witness that she would like to have a mausoleum for the family, and that was one thing she was going to do. This was a year or two

before Miss Pfaff's death. The witness was asked if Mrs. Hanna ever invited her to Portsmouth to see Miss Pfaff, and she answered: "No, sir, and the second time she didn't invite me back." The witness stated that Miss Pfaff told her, while she was at her home in Greenup in July, that every time she talked of coming home it made the Hannas mad.

Mrs. Anna Keenan testified that she had been acquainted with Miss Pfaff about 7 or 8 years; that she had worked for her and stayed with her; that Miss Pfaff talked to her about her legal affairs and she helped her with her business. It was this witness, Mrs. Keenon, who started from Greenup to Cincinnati and Lexington with Miss Pfaff, referred to in the first part of the testimony of Mrs. Kinner. Mrs. Keenan stated that she went to the hospital with Miss Pfaff when she had the X-ray made, and was with her when she got hurt and stayed with her part of the time after that. She stated that Dr. Hanna treated Miss Pfaff at various times after the death of Miss Pfaff's brother, and she went to Portsmouth with her on several occasions for the purpose of treatment. Reverting to the contemplated trip to Cincinnati and Lexington, Mrs. Keenan told about starting with Miss Pfaff on this trip, and, when they reached Portsmouth they stopped at the Hannas' home, but she said that Miss Pfaff did not go to take a treatment. Miss Pfaff asked Dr. Hanna if Mrs. Hanna could go with them. They went out in Portsmouth and spent the afternoon with a friend. Dr. Hanna's son came after them, and, when they started, they found the Hannas and some real estate men waiting for them. They began discussing the purchase of property, and, while inspecting a house, Miss Pfaff fell into a basement and injured her leg. They took her to a hospital for treatment for her injured leg, and, after receiving treatment, the Hannas took her to their home, and Mrs. Keenan remained there with her for 6 weeks. At the end of 6 weeks Miss Pfaff was able to walk with the assistance of some one and a crutch. Then Miss Pfaff's limb began to swell, and they had an X-ray made, which disclosed that she had a broken bone. She then went back to the hospital and stayed about a week. She stated that Miss Pfaff wanted her to stay with her during her injury and to stay at the Hanna home, and said, "If I would stay she would make it alright with me. I wanted to take her to my

home or her home over there, but we **never** got that far.'' The witness was asked:

Q. ''Did Miss Pfaff ever discharge you? A. No, sir, we were always the best of friends; Mrs. Hanna kicked me out, she took the bed away from me; I had no bed I told her I could make out with a cot but she wouldn't let me have that; I had no bed to sleep on.''

This was about the 6th or 7th of June. The witness stated that she went back on two or three visits to see about Miss Pfaff, and that Mrs. Hanna and Dr. Hanna would start an argument and she (the witness) would go out and cry. She said: ''I told Miss Pfaff and she would fill up so, so I came away from her (Hanna's) home and didn't go back any more.'' The witness stated that Miss Pfaff frequently expressed a desire to return to her home in Greenup and said ''she was going home, folks said she was going to die.'' Mrs. Keenan told her that she had better call Judge Thomas and make her will, and Mrs. Hanna said, ''No, we will get Bannon.'' On cross-examination Mrs. Keenan stated that Miss Praff had talked to her about making a will and said she wanted her friends taken care of and that she wanted a trust fund for a mausoleum and wanted a certain amount laid aside for relatives to be equally divided; that her debts and funeral expenses be paid and the remainder go into a mausoleum.

D. B. Warnock and Ona Tibbits were the subscribing witnesses to the will. Mr. Warnock's testimony was favorable to appellants respecting the competency of Miss Pfaff, and the absence of improper influence, etc., but he admitted that Mrs. Hanna objected to his reading the will. Miss Tibbits testified that she did not even know she was witnessing a will; that she thought it was something about a mausoleum, and it was several days later before she knew that the paper she signed was a will. Miss Tibbits, referring to the visit to Miss Pfaff in company with Mrs. Kinner, stated that she talked to Miss Pfaff about the document she had signed as a witness, in this language:

''I said, that paper that Mr. Warnock and I signed, was that something concerning the mausoleum, and she seemed like she was afraid, and she said, 'I didn't know what I was doing, Mrs. Hanna had me so scared, she told me I might die, I didn't know

what I was doing when I signed that,' and I asked her what it was, was it anything about the mausoleum, and it seemed like she didn't know.''

Dr. Massie of Haverhill, Ohio, stated that he was called to Miss Pfaff's home in Greenup about July 25 (previous to the execution of the will, August 2d). He found her to be in a very serious condition, suffering from malignant cancer of the stomach and possibly of the duodenum. In answer to a question to tell the jury what transpired during his visit there, the doctor said:

''It was rather early in the morning, I found the lady in bed, some other lady was in the room who I didn't know; Miss Pfaff was in a highly nervous state, seemed to be in an expectant state of mind, dread, she would want the door closed and start at a foot-fall on the walk, it seemed to alarm her, or a knock on the door; she was in an expectant state of mind; something she was fearful of; and when I begun to question her to get some history of her family or her history, she wouldn't answer me with any satisfaction at all, rather to mislead me than to be helpful to me so that I might help her.''

The doctor further stated that he considered death only a short space of time. In response to a hypothetical question with respect to her mental condition or ability to dispose of her property, he said he did not consider her capable of knowing the extent of her estate or to dispose of it according to a fixed purpose of her own.

Dr. H. T. Morris testified that he had had some experience in treating cancer and described its symptoms and effect, and stated that it usually affected the mind, and that the mind and body weakened together. Answering a hypothetical question relating to the condition of Miss Pfaff, the doctor gave it as his opinion that Miss Pfaff had not will power enough to carry out her desires.

Drs. Huffman and Johnson, in answer to the same hypothetical question, stated that in their opinions Miss Pfaff was incapable of disposing of her property at the time she made the will. Mrs. William Harrison stated that Miss Pfaff and Mrs. Hanna called on her about the 15th of July, 1932; that she had a conversation with Miss Pfaff, and she inquired of her about Mrs. Keenan, and said that she was trying to locate her and asked

Mrs. Harrison to try and locate Mrs. Keenan for her. During the conversation, Mrs. Hanna said that Miss Pfaff was not able to go home; that the doctors said she was not able to go home. Miss Pfaff said that it looked like if she could take long rides in the machine she would be able to go home and stay in bed and that Mrs. Keenan could take care of her.

Mrs. Emma George who lived near Greenup stated that she had worked for Miss Pfaff at various intervals for the last 7 or 8 years, and was staying with her the latter part of July and 1st of August, 1932; that Miss Pfaff came to her home from Portsmouth on July 19th and stayed until August 3d, the day following the execution of the will. On the morning Miss Pfaff left for Portsmouth (August 3rd), Dr. and Mrs. Hanna came into the kitchen and told her Miss Pfaff wanted to speak to her, and Mrs. Hanna said they were going to Portsmouth that evening. Miss Pfaff told her that "they was going to drag her out again." She stated that Miss Pfaff did not seem to want to go back to Portsmouth, and said she would be back; that she had two more treatments to take and would be back home and wanted Miss George to stay with her. Miss George stayed at Miss Pfaff's home waiting for her return, but she died three weeks later.

Miss George further stated that Miss Pfaff's mind seemed to be all right so far as she observed. She stated that she had heard Miss Pfaff speak of what she was going to give her friends but never mentioned any names, and that Miss Pfaff told her that she was going to will her something, but she did not say what it was. Later, she stated that Miss Pfaff said she was going to will Miss George's brother and father something, and also mentioned the Kinner children. She stated that she had heard Miss Pfaff speak of her cousin, Barbara Eiche, but she never mentioned her in connection with her will. Miss Pfaff mentioned Lester Lynn, a preacher, and said she was going to give him a feather bed.

Georganna Hern testified that about a month previous to the death of Miss Pfaff she visited her at her home in Greenup. She described her as being a very sick woman and seemed to be worried and talked about getting another doctor. Miss Hern suggested a doctor and advised that she call him. Miss Pfaff seemed to be afraid that this doctor in Portsmouth (meaning Dr.

Hanna and his wife) would not like it. Miss Pfaff also talked about another doctor and seemed not to be satisfied with the medicine she was taking. Miss Hern asked Miss Pfaff why she did not go home with her, and she said that the doctor's wife in Portsmouth (Mrs. Hanna) insisted on her going home with her, and said, "I am going to feel better off where I am here in my own home." A few days later Miss Hern returned to Greenup and saw Miss Pfaff and found her condition had grown worse and she seemed to be suffering. She again suggested that Miss Pfaff go to her home and Miss Pfaff said "these people (the Hannas) had insisted on her going to Portsmouth and said she thought she was better off in her own home."

J. E. Pollock, a banker of Greenup, stated that he was 79 years old and had known the Pfaff family as long as he could remember. He stated that Miss Pfaff did her banking business with him, and she consulted him from time to time relative to her affairs and investments. He stated that about the 14th of June, previous to Miss Pfaff's death, Mrs. Hanna called him over to the Pfaff home. He responded to the call, and Miss Pfaff wanted her safety deposit box and he took it to her, and she told him she wanted some money and drew her check for $200, and he delivered the money to her, and then she drew another check for $100, which was also delivered to her. When he took the money over to Miss Pfaff, Mrs. Hanna had the safety box which she later brought back to the bank. Miss Pfaff told him at that time that she was thinking of buying property in Portsmouth and mentioned the price of various pieces of property. He asked her why she wanted to buy property, and she said that Mrs. Hanna wanted them to live there together. He further stated that he advsed Miss Pfaff not to buy the property. Miss Pfaff did not say anything about deeding the property to Mrs. Hanna, but left the impression that she was buying it for herself.

Mrs. Hanna was called by plaintiffs as though on cross-examination, and was presented with copies of the two deeds, each of which was dated June 29, 1932. These deeds disclose that on that date one Dan W. Conroy and his wife had conveyed to Miss Pfaff a house and lot in Portsmouth for a recited consideration of "$1.00 and other good and valuable and sufficient considerations"; but Mrs. Hanna said that Miss Pfaff

paid $10,000 in full for the property at the time the deed was made. She paid $6,000 in bonds and $4,000 in cash. And on the same day Miss Pfaff conveyed the same property to Mrs. Hanna for the recited consideration that Mrs. Hanna would provide a "home, food, and care for the grantor, of such character as the grantor is now enjoying, and such nursing and osteopathic care as the maintenance of her health may require, during the lifetime of the grantor." Mrs. Hanna stated that Miss Pfaff took the $6,000 in bonds from the safety deposit box at her home in Greenup at the time Mr. Pollock testified that Mrs. Hanna called him from the bank and at the time he took Miss Pfaff's safety box to her. Mrs. Hanna admitted that she knew Miss Pfaff was a sick woman and that she knew that a diagnosis about the 1st of June revealed that she was suffering from cancer, and admitted that she knew that she had cancer of the stomach at the time the deed was executed. She was asked:

"Q. You are familiar with the fact and know that a woman of that age couldn't live long? A. No, sir.

"Q. You didn't know that Carrie Pfaff wouldn't be expected to live long with cancer of the stomach? A. My mother lived two years with cancer.

"Q. For the consideration of taking care of her as long as she lived you were to receive a $10,000 piece of property. A. Absolutely."

She was asked about other property which she had in her possession belonging to Miss Pfaff, and she said that she had about $10,000 of Miss Pfaff's property in a box at the Royal Building & Loan Bank. She said she knew that Kendall Seaton was administrator of Miss Pfaff's estate, but she had not turned the property over to him, that the box it was in belonged to Miss Pfaff, and that she had it for safe-keeping. She stated that she got the money out of Miss Pfaff's pocketbook after she died. There was also a note for $4,500 secured by mortgage and another note for $300 and a deposit certificate for $951. She said that she had attempted to have Miss Pfaff's will probated in Ohio, but that the court refused to let her probate it. She was asked if she would turn this property over to Mr. Seaton, the administrator, but the record discloses no answer. She was asked about the preparation of the will, and she

admitted that she wrote the will, but gave rather an indefinite answer or explanation as to where she got the form of attestation in the will. She said that she did not know whether she got it from a form book, but had an idea that she did; that they had such form books in school and she had seen it in law books; that she had worked as stenographer in various law offices and for a newspaper publishing company. She did not state that she copied these forms direct from a book at the time she wrote the will, but said she got part of it out of a book, but was not sure that it was all out of the same book. She stated that the will was written in Portsmouth, and she prepared it from notes she had obtained from Miss Pfaff, indicating the persons to whom she desired to leave her property. She obtained the papers from Miss Pfaff's home and went to Portsmouth and prepared the will and then returned to Greenup.

According to the evidence of various witnesses Mrs. Hanna devoted much, if not practically all, of her time to the care of Miss Pfaff. Owing to the nature of the disease, her nursing and care required unpleasant and undesirable duties. Mrs. Hanna details many nauseating and unpleasant duties necessary for the relief and comfort of Miss Pfaff. According to the uncontradicted evidence of a number of witnesses. Mrs. Hanna gave Miss Pfaff the best of care, and, so far as the record discloses, she did all she could for her. One witness testified that Miss Pfaff said, "No one would do for me what Mrs. Hanna has, excepting a mother." She made similar statements to other witnesses. Mrs. Hanna denies any attempt or idea of exercising undue influence over Miss Pfaff or any wrong motive for the services rendered her. She insists that it was purely an act of human kindness. Mrs. Hanna's service and care for Miss Pfaff is referred to by counsel for appellants as a "beautiful picture of human service." That is true if the services were prompted from a heart of human kindness and not from any sinister motive, but, if rendered with the view and for the purpose of taking advantage of Miss Pfaff's unfortunate condition, and thereby wrongfully obtaining from her her property, the picture then loses its beauty, as well as its virtue. The kind of service rendered is not the question, but the motive prompting these services is the gist of the issue. Two or three doctors who testified for appellants contradicted the doctors who testified for the appellees respecting the mental condition of Miss Pfaff and the

effect of cancer of the stomach on the mind. Many other witnesses testified favorably to the appellants. The evidence is conflicting as relating to the issue whether or not there was undue influence brought to bear on Miss Pfaff respecting her devise to the Hannas. But we are not concerned with the mere preponderance of the evidence. That was a question for the jury. The only province of the court in jury cases with respect to the evidence is to determine whether or not there is any evidence to support a verdict or whether the verdict is flagrantly and palpably against the weight of the evidence.

Direct proof of undue influence can seldom be had. Like any other fact, it may be proven by circumstances, and, though each circumstance standing alone might be quite inconclusive, yet the effect of all the circumstances when taken together may be convincing. Walls v. Walls, 99 S. W. 969, 30 Ky. Law Rep. 948.

In Douglas' Executor et al. v. Douglas, 235 Ky. 121, 29 S. W. (2d) 637, 644, we said:

"But it is earnestly insisted that there was no evidence of undue influence, and that this question should not have been submitted to the jury. In this connection, reliance is had upon the rule that it is not sufficient merely to show that there was an opportunity to exercise undue influence, or that there was a possibility that it was exercised, but that some evidence must be adduced showing that such influence was actually exercised. Brent v. Fleming, 165 Ky. 356, 176 S. W. 1134; Childers' Ex'x v. Cartwright, 136 Ky. 498, 124 S. W. 802; Cecil's Ex'rs v. Anhier, 176 Ky. 198, 195 S. W. 837. While the above rule is well settled, it must not be overlooked that undue influence can rarely be shown by direct proof, but it is a matter to be deduced from the facts and circumstances leading up to, and attendant on, the execution of the will. Among the circumstances that may be considered are mental incapacity, confidential relations between the testator and beneficiary or his representative, active participation by the beneficiary or his agent in the preparation of the will, the exclusion of near relatives, and the result accomplished. Bradford v. Kinney, 216 Ky. 348, 287 S. W. 921; Fry v. Jones, 95 Ky. 148, 24 S. W. 5, 15 Ky. Law Rep. 500, 44

Am. St. Rep. 206; Lisle v. Couchman, 146 Ky. 345, 142 S. W. 1023; Yess v. Yess, 255 Ill. 414, 99 N. E. 687; Chappell v. Trent, 90 Va. 849, 19 S. E. 314; 28 R. C. L. 146.''

See, also, Wood's Ex'r v. Devers, 19 S. W. 1 [14 Ky. Law Rep. 81]; Yess v. Yess, 255 Ill. 414, 99 N. E. 687.

McDowell v. Edwards' Adm'r, 156 Ky. 475, 161 S. W. 534, 535, it is said:

''The law looks with suspicion upon the transfers of property, by persons mentally or physically infirm, to those having custody of them. Even when parties in good health stand in a confidential relation to each other, the burden is upon the stronger character, who procures an advantage, to show that a transaction was fair; and relief will be afforded in equity in all such transactions in which influence has been acquired and abused, in which confidence has been reposed and betrayed. Allore v. Jewell, 94 U. S. 512, 24 L. Ed. 260. The relief stands upon the general principle applying to all the varieties of relations in which dominion may be exercised by one person over another. Smith v. Kay, 7 H. L. Cas. 750; Tate v. Williamson, L. R. 2 Ch. 61.''

See to the same effect Moore's Adm'r v. Edwards, 248 Ky. 517, 58 S. W. (2d) 915.

In Gross v. Courtley, 161 Ky. 152, 170 S. W. 600, 603, Judge Carroll, writing for the court, said:

''The law likes to uphold contracts that are made when people are dealing at arm's length, when each one of them is able to take care of his own interests, and when one is as able to understand the nature and effect of the transaction as is the other. But when one of the parties is old or feeble or weak, and the other is strong and vigorous, or when relations of extreme confidence and affection exist, the parties do not occupy toward each other that attitude of business freedom that would enable each to deal with the other on equal terms, and hence the protecting care of the courts.''

The uncontradicted evidence tends to show that the cancerous condition of Miss Pfaff started in the fall of 1931 and steadily grew worse until her death. Dr. and Mrs. Hanna were treating her all that time,

and it is a reasonable inference that they learned the nature of her disease and, naturally, that death would ensue within a short time. Mrs. Hanna admits that she knew about the 1st of June that Miss Pfaff had cancer of the stomach. It is also shown that Mrs. Hanna had almost exclusive charge of Miss Pfaff from April until her death, and it is reasonably clear that she guarded her zealously and was reluctant to permit other friends to wait on her or even associate with her. Had Miss Pfaff been unable to pay doctors and nurses and had been an object of charity, Mrs. Hanna's claim that she rendered the service out of a heart of human kindness without expectation of financial reward would then more favorably coincide with human nature and known traits of human character. But, to the contrary, Miss Pfaff was amply able to employ all necessary medical care and attention. It would indeed require a far stretch of imagination to assume that Mrs. Hanna would have devoted such time, care and attention to Miss Pfaff without any view of expectation of financial reward.

Counsel for Mrs. Hanna insist that she should be rewarded for her services. That may be true; but she should resort to appropriate legal remedies.

The will is carefully and adroitly written. Item 22 in part reads:

"Any balance remaining in my estate after the carrying out the directions of my will, I direct that the same be paid to my good friend, Mrs. Frances Hanna, who will carry out some personal matters which I have discussed with her during my life."

This clause may be the result of ingenuity and foresight with the belief that, if the deed to the property in Portsmouth should be held invalid, the property would then go to Mrs. Hanna under the will, and was inserted as a second line defense in the event the deed should be attacked. Of course, the conveyance of the Ohio property to Mrs. Hanna is not in issue, and that question has no place in this record, except as a part of the chain of evidence on the question of undue influence. With reference to all other devisees excepting Mrs. Hanna, there is but slight evidence tending to show undue influence, and such as there is, is only by inference

drawn from the circumstances. It is reasonably clear from the uncontradicted evidence of a number of the witnesses for each party that Miss Pfaff had noted on paper from time to time various acquaintances and friends to whom she intended to leave certain parts of her estate. This is particularly true with reference to the mausoleum. It seems that this was a cherished idea and memory she had entertained since the death of her brother. There can be but little doubt that Miss Pfaff had decided to set apart a certain portion of her estate for the purpose of the construction and maintenance, etc., of a mausoleum for herself and family. The same intention is equally clear as to a number of the other devisees. Many of the items of the will are of rather insignificant character—some of which consist of certain household articles, and others small sums of money. Among the larger ones are to Miss George, her servant girl, and Mr. Davidson, her gardener. In the circumstances, it was not unnatural for her to remember them. Moreover, it is shown by the evidence that she had stated prior to her illness that she intended to give Miss George and Mr. Davidson and a number of other devisees something of her estate.

The facts and circumstances disclosed by this record, viewed in the light of the authorities herein cited, impels us to the conclusion that the evidence is amply sufficient to support the verdict of the jury as to the appellants Dr. and Mrs. Hanna and their children.

There is no evidence tending to show that Miss Pfaff had expressed any desire or intention of leaving any of her property to the Hanna children, and no doubt the same influence that obtained the devises to Dr. and Mrs. Hanna applied to their children.

Item 21 of the will directs the construction of a mausoleum containing its crypts, five of which to be occupied by Miss Pfaff and her family and the sixth at the disposal of Mrs. Hanna. We think the mausoleum should contain only five crypts and the one provided for the disposal of Mrs. Hanna should be eliminated. This would reduce the cost of the mausoleum and it may not become necessary to expend the full sum of $10,000 in the construction thereof.

It is insisted for appellant that the court erred in refusing to give to the jury instruction C offered for appellants, containing this clause.

"But any reasonable influence obtained by acts of kindness or by appeals to the feelings or understanding, and not destroying free agency, is not undue influence."

It may not have been improper for the court to have given such instruction; but, in view of the instruction given, we do not think that the omission of the offered instruction was prejudicial. Martin et al. v. White, 177 Ky. 653, 197 S. W. 1079; Bean's Adm'r v. Bean, 216 Ky. 95, 287 S. W. 239.

The court gave instruction No. 3 as follows:

" 'Undue influence' as used in these instructions is such influence as obtains dominion over the mind of the deceased to an extent that destroys free agency on her part in the disposal of her estate and constrains her in respect thereto to do that which she would not have done if left to the free exercise of her own judgment; and it is not material when this undue influence was exercised, if it was present and operating on the mind of the deceased at the time the paper read in evidence was executed."

This form of instruction or definition of undue influence has often been approved by this court. Wood v. Rigg, 152 Ky. 242, 153 S. W. 214; Hall v. Hall, 153 Ky. 379, 155 S. W. 755.

The instruction given advised the jury that "undue influence" was such influence as operated to destroy the free agency of the testatrix. If the jury so believed, then it was its duty to find that there was undue influence, and the manner of obtaining it is immaterial, if it was to such an extent and of such a nature as to destroy the free agency of the testatrix. Furthermore, the offered instruction is the converse of the given instruction put in affirmative form, and it was not error to refuse it. Postal Telegraph Cable Co. v. Young, 172 Ky. 576, 189 S. W. 707.

Appellants also complain of remarks made by counsel for appellee in their argument to the jury. Dr. Raymond Hanna did not appear as a witness, and counsel made reference to this fact. The record discloses that objection was made to those remarks, which were overruled, but no exception was taken to the

court's ruling. The further complaint is that counsel said to the jury: "If the will is broken I pledge you that a mausoleum will be built." The court sustained objections to that statement and excluded it from the jury. It appears that counsel for appellants had insisted that if the will was broken the mausoleum would never be built, and the argument of counsel for appellee that it would be built was in the nature of a response to the argument of opposing counsel. In view of these circumstances, and inasmuch as the court excluded the remarks from the jury, we do not think they were prejudicial.

Instruction No. 4 given to the jury is as follows:

"The jury are instructed that they may find some of the paragraphs of the will to be the last will of Carrie Pfaff and some of them not to be her last will; if you shall find and believe that she was of sound mind as set out in Instruction No. 2, and shall further believe that, though of sound mind as described in Instruction No. 2, yet shall believe that some of said clauses or items were the result of undue influence as described in the Instruction 3 then you will find such items in the will as you believe from the evidence was the result of undue influence, as described in instruction No. 3, not to be the last will of Carrie Pfaff, and the remainder of said will to be her last will and testament, and if you find some of the paragraphs to be her will, and some not to be her will, then you will say in your verdict which of the paragraphs are her will and which paragraphs are not her will."

This instruction is not complained of in the motion and grounds for a new trial.

But it is argued that if the will was obtained by undue influence on the part of any one of the devisees, then the whole will must fail, even though the other devisees or beneficiaries may have been innocent of any improper conduct To support this argument, the case of Rounds v. Rounds, 214 Ky. 294, 283 S. W. 77, is relied on. But it must not be overlooked that in the Rounds Case the will was set aside for mental incapacity and undue influence; while in the case at bar, the jury specifically found the paper not to be the will of

304

Carrie Pfaff, because it was obtained by undue influence. If the jury had found that the will had been obtained by both undue influence and mental incapacity, a different case might have been presented. Irvine v. Greenway, 220 Ky. 388, 295 S. W. 445; Section 4859, Kentucky Statutes.

Under the above instruction, the jury had the right to find that certain clauses of the will devising to certain devisees were the result of undue influence, and other clauses devising to certain other devisees were not the result of undue influence or fraud, but the will of the testatrix. As stated above, the jury is amply sustained by the evidence in its finding that the clauses of the will devising to Mrs. and Dr. Hanna and their children were the result of undue influence; but our conclusion is that the verdict is palpably and flagrantly against the great weight and preponderance of the evidence with respect to all the other devisees and as to the fund providing for the mausoleum. The administrator may be directed to construct the mausoleum at a cost not exceeding $10,000.

Wherefore the judgment is affirmed as to the appellants Frances Hanna and Dr. Raymond Hanna and their children, but reversed in all other respects, all of which is remanded for proceedings consistent herewith.

Whole court sitting.