## Egan, et al. v. Egan's Executor, et al.

(Decided October 19, 1920.)

Appeal from Jefferson Circuit Court (Common Pleas, Division No. 2).

Wills—Testamentary Capacity—Undue Influence.—In an action contesting the will of testatrix the evidence shows many months before making her will she made up her mind just how she desired to dispose of her property and that she carried out this purpose completely and entirely in the paper executed. It is manifest from the evidence that she had sufficient testamentary capacity and was not affected by undue influence.

HUBBARD & HUBBARD for appellants.

O'DOHERTY & YONTS and LAWRENCE J. MACKEY for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

Mrs. Winifrede Egan, aged about eighty years, executed her last will and testament on July 5, 1917. She died in April following, survived by her son, the plaintiff, Edward Egan, and several other children and a number of grandchildren, some of whom are also plaintiffs in this action. Her will was duly probated in the Jefferson county court. This action assailing the validity of the will was instituted in the Jefferson circuit court on the 29th of April, 1919. After issue joined a trial was had before a jury but the court peremptorily instructed the jury to find and return a verdict sustaining the will, which was done, and of this complaint is made upon this appeal.

The will reads as follows:

"Louisville, Kentucky.

"I, Winifrede Egan, being of sound mind and disposing memory, do make, declare and publish this my last will and testament hereby revoking all wills heretofore made by me.

"Item 1.   I desire all my just debts and funeral expenses paid as soon as possible after my death.

"Item 2. I give, bequeath and devise my property at 1726 Portland avenue, Louisville, Ky., and household effects to my daughter, Mary O'Conner.

"Item 3. I bequeath to my son, Edward Egan, the sum of $5.00.

"Item 4. All the residue of my estate, after the payment of debts, I give, bequeath and devise to my sons, Micheal Egan, and Patrick Egan, and my daughter, Nellie Egan, share and share alike.

"Item 5. I do not desire any part of my estate paid to John's wife or children.

"Item 6. I name, and nominate and appoint my daughter, Nellie Egan, as executrix of my will and request that she be allowed to qualify without surety on her bond.

"Witness my hand this 5th day of July, 1917.

                her
"WINIFREDE x EGAN.
                mark

"Signed by the testatrix, Winifrede Egan, in our presence, and declared to be her last will, and we at her request and in her presence, and in the presence of each other, have signed and witnessed the same such will this 5th day of July, 1917.

        "Otion G. Hardin,
         E. J. Whitehead,
        Lawrence J. Mackey."

The petition charges that the paper above copied "is not the last will and testament of said Winifrede Egan for the reason that the said Winifrede Egan at the time said paper is dated and was executed on the 5th day of July, 1917, and for a long time prior thereto, was not of sound mind and memory, but by reason of age and feeble health, was mentally incapacitated from making a will and on account of her old age and incapacitation, she did not at said time have such mental capacity as to enable her to know the objects of her bounty and her duty to them, or the character or value of her estate, or to make a rational survey of her estate and dispose of it according to a fixed purpose of her own. Plaintiff says that said Winifrede Egan was persuaded and coerced into signing said paper by the undue influence of the defendants and others, conspiring with them, and by the false and fraudulent and collusive representations of the said defendants and each of them and by others at their suggestion, influencing

and prejudicing the weak mind of Winifrede Egan, all of whom are unknown to plaintiff.''

All these allegations are specifically denied by the answer. The execution of the will was duly and properly proven on the trial, whereupon the burden shifted to the contestants. The first witness called by contestants was the plaintiff, Edward Egan, a son of the testatrix, who deposed that he was fifty-one years of age, and lived in Louisville, and had been a street car motorman; that his mother died April 1, 1918, after making a will on July 5, 1917; that she was illiterate and unable to read or write; that she had been in ill health for about two years before her death; that his brother John had died in June before the will was made in July, 1917, and that at her death Patrick, Mike, Edward, Ella and Mary were the only children surviving the testatrix; that on July 4th, he was telephoned to come to his mother's home and informed that she was very sick. He then testified as follows:

''When I went in Ella said 'keep quiet,' she said 'mother has been raving all day, and I think she is going to die.' 'Well' I said, 'I am going in and look at her any how.' I walked in and looked at her and she looked like as she was in a stupor.

''Q. Was she able to recognize you? A. No, sir. Q. How long did you stay down there that evening? A. Well, I stayed there about an hour—about. Q. Well, did you have any conversation with the other members your brothers and sisters? A. Yes, sir; Mike said 'come out here, I want to have a talk with you.' I said 'all right.' We went out and sat on the front steps. He said, 'Ma cannot last much longer, and I am going to have a will made, don't you think it would be a good idea?' And I said 'I don't know.' He said, 'I want to leave one of these houses to Mary and the other one to Ella.' I said, 'That is all right, I don't object to my sisters having a house apiece.' And I said 'What else are you going to do?' 'Well,' he said, 'We will take the money and divide it up amongst ourselves.' I said 'What are you going to do about John's children?' He said 'To hell with them sons-of-bitches, I don't intend to give them a cent.' Q. What did you do when he said that? A. I said 'I will not have anything to do with it.' I said 'You can't do anything like that.' He said 'Oh, yes, my lawyer told me, Mackey told me I could do that.' I said 'Well, I will not

have anything to do with it, I am done with it right now.'
Q. Did you leave then? A. I left—yes, sir.''

The foregoing evidence is all that was given or offered by appellants which in any measure tends to support the allegations of their petition as amended that the testatrix was of unsound mind, incapacitated to make a will, or was unduly influenced in the disposition of her property, although there is quite a volume of evidence offered by appellants which has no apparent relevancy to the issue.

It will appear from a casual examination of the evidence above quoted that appellant, Edward Egan, son of testatrix, had no conversation whatever with his mother on the evening of his last visit to her home but that he did go into her sick room and look at her, and ''she looked like she was in a stupor.'' Further along in his testimony he says that she was asleep. If she was asleep, as appears from all the evidence in the record, it would have been rather difficult, we apprehend, to determine whether she was or had been in a stupor other than such as comes from slumber. According to Edward Egan's testimony he stayed there about an hour, although this is contradicted by all the other witnesses who say he was not there more than about ten minutes, and that he did not in fact go into the room of his sick mother. The most important evidence given by Edward Egan with reference to what happened at his mother's home that evening is that which ostensibly relates a conversation had with his brother Mike on the front door steps out of the presence and hearing of his sick mother and other members of the family. He deposes that his brother Mike said ''Ma cannot last much longer, and I am going to have a will made. Don't you think it would be a good idea?'' and I said ''I don't know.'' He said ''I want to leave one of these houses to Mary and the other one to Ella.'' I said ''That is all right. I don't object to my sisters having a house apiece,'' and I said ''What else are you going to do?'' ''Well,'' he said ''We will take the money and divide it up amongst ourselves.'' I said ''What are you going to do about John's children?'' He said ''To hell with them little son-of-bitches, I don't intend to give them a cent.''

The witness intimates that he thought that his brother Mike was under the influence of intoxicants at the time he made the foregoing statement. However, Mike and his two sisters testify that Edward did not have any such conversation or any conversation at all with Mike at the house on the evening in question, for

the very potent reason that Mike was not there at that time. This evidence of Edward is intended to establish an undue influence on the part of his brother and sisters over their aged mother in the making of the will, and it is evidence which would in a measure tend to that end if there was any proven fact that Mike or the other members of the family had in the slightest degree attempted to influence the testatrix in the disposition of her property, or had caused her to make a will. While the overwhelming weight of the evidence contradicts the statement of Edward with reference to what he said to his brother Mike and what his brother Mike said to him on the evening of July 4th, his evidence does not go to the extent, if accepted as true, of showing that there was any undue influence attempted on the part of Mike or any of the other members of the family, much less showing that such influence was actually exerted.

Dr. Taylor, who attended the testatrix in her sickness on July 4th and 5th, 1917, which was the day before and the day on which the will was executed, says that he had known her for many years and that she had a will of her own. Further testifying he said she ruled her own household "pretty strongly," and that she did not let anybody get much the best of her although she was a mighty nice old lady at that; that he saw her frequently and that she was rational and knew what she was talking about and was attending to her daily routine of buying her groceries and trading with her butcher. She expressed to her family physician her humiliation at the conduct of her son Ed. (appellant here) because he had been cohabiting in a most disgraceful way with a woman of very low character, and confided to the doctor that it was "her purpose to cut Ed. (appellant) out (of her will) because he had disgraced her." This was months before the making of the will. It further appears from the testimony of Lawrence J. Mackey, who drew the will for Mrs. Egan, that she had requested him some six months previous to the date it bears to prepare her will, and indicated that she would call upon him to perform that service. When she suddenly took sick on July 4, she was brought to the realization of the necessity of preparing the testamentary paper, and she thereupon requested one of her daughters to call attorney Mackey and ask him to come to the house to prepare the will. Mackey testifies that he reached the house late in the evening and found Mrs. Egan seated in her chair with her two daughters present. Before he

began the preparation of the testamentary paper he suggested that the daughters withdraw from the room, which they did. The testatrix then carefully, directly and without equivocation told the attorney how to prepare her will and informed him what disposition she wanted to make of her property. Following this direction the attorney then and there in the presence of the testatrix prepared the whole writing which is copied above. He then read it over to her carefully and when he had finished she said, "That is just the way I want it." Two business men were then called in as witnesses and the will was again read to the testatrix and to the witnesses, and Mrs. Egan again indicated that the paper was exactly as she wanted it. She then signed it by mark in the presence of the witnesses and the witnesses also signed. All these persons present testify that Mrs. Egan was in possession of her mental faculties, fully understood what she was doing, knew the objects of her bounty and was able to make a rational survey of her property and had the will power to dispose of it according to a fixed purpose of her own. There is not a single suggestion in the record anywhere that the testatrix was not a woman of strong mental qualities and of fixed and immovable purpose, unless the testimony of appellant Edward Egan wherein he says she "appeared to be in a stupor" on the night of July 4th may be held to imply this. But since by all the evidence it is shown that she was sleeping at the time he said she "appeared to be in a stupor" this evidence could have no probative value.

Some of the grandchildren who are contestants also testify that the testatrix did not know them on one occasion when they went to her house and that she looked sick and very feeble. No doubt this is true, because we learn from these same witnesses that they had scarcely ever associated with the grandmother and had seldom, if ever, been to her house; that her eyesight was dimmed and she was rather sick and was at that very time much grieved over the sudden death of her son John which had happened on that particular day. It is not strange that an old lady under all these circumstances did not recognize young people whom she had seldom seen when they came into her room, and we do not think that her failure to so recognize them is any evidence whatever of her mental unsoundness or incapacity to make a will.

The evidence convinces the court that Mrs. Egan had many months before the making of the will made up her

mind just how she intended to dispose of her property and that she carried out this purpose completely and entirely in the paper which she executed. That she was not easily influenced and was not in fact influenced by any of the beneficiaries named in the will, or by any other person in the making of her will or the disposition of her property, is manifested from all the facts and circumstances, and we are unable to find any evidence worthy of the name tending to show mental unsoundness on her part, or undue influence, and the trial court quite properly instructed the jury to find and return a verdict holding the paper in question to be the last will and testament of Winifrede Egan.

Judgment affirmed.