## Jackson's Executor v. Semones.

(Decided May 12, 1936.)

ERROL W. DRAFFEN for appellant.

CHAS. A. HARDIN and CHAS. S. MATHERLY for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

The judgment set aside the will of Mrs. Martha E. Jackson. She bequeathed her estate of about $2,800 to Mrs. Mary Lou Sanders, except $1 only to her daughter, Mrs. Marie Semones, "for good and sufficient reasons known and understood by both of us." The reasons for the bequest to Mrs. Sanders are thus given:

"In explanation of this devise and bequest I desire to say that for nine years I have lived in the home of Mary Lou Sanders, in Harrodsburg, Kentucky, and during a large portion of that time I have been ill and have constantly needed the care and attention of some one and during all of this time Mary Lou Sanders has administered to my every care and need and because of her loving care, kindness and goodness to me I desire that she have all of my property.

"I have heretofore given to Mary Lou Sanders all of my property described in the second paragraph of this will and have stated in a writing evidencing the gift my reasons for so doing, but for fear there might be some question as to the legality of a gift of this kind I felt that in addition to the gift I should make a will of the same property to Mary Lou Sanders."

The testatrix and her husband, Andrew Jackson, lived on a farm until about 1921. They were violently opposed to their only daughter marrying her second cousin because of an idea that the consanguinity would result in insanity in children born of the union. According to her testimony, they ran away from home just before her marriage on June 2, 1920. At home she had been a hard working, dutiful daughter, but her mother never took an interest in her education or had any affection for her. She didn't remember her mother ever having kissed her or given any kindly advice or suggestion. She was very indifferent, not only to her daughter but to all her relatives. When she was packing her things to leave home, her mother wanted her to leave a watch and ring she had given her and said she would never get anything they had. The estrangement between mother and daughter broadened when the daughter successfully contested her father's will in opposition to her mother, which was about nine years before she died. During the fourteen years Mrs. Jackson lived in Harrodsburg, her daughter, who also lived in or near there, never came to see her, and when passing on the streets they did not speak to one another. Mrs. Semones did not send her children to see their grandmother because, she testified, she knew her mother was not fond of children and did not like them. After the death of her husband in 1926, Mrs. Jackson went to live in the boarding house of Mrs. Sanders, appellee.

In 1930 when Mrs. Jackson was seriously ill, her daughter called on the telephone to inquire about her. Mrs. Sanders told her she would be welcome to come to see her mother so far as she was concerned, but her mother was very nervous and she didn't think it advisable. Mrs. Semones was willing and wanted to see her mother, she testified, but thought perhaps it was best not to go, and she did not. Shortly before her death in February, 1935, she again talked with Mrs. Sanders, but did not go to see her mother, although she did attend her funeral. Mrs. Semones expressed the opinion that she was not mentally qualified to make a will, basing it upon her actions when she started going with her future husband, and because she was moody and "would go all to pieces" when anything didn't suit her.

Several witnesses who had little or no association with Mrs. Jackson for twelve to fourteen years before

her death expressed the opinion that she did not possess mental capacity to make a will. One thought so because she was high tempered and was easy to get mad; had been expelled from school for not minding her teacher, and was not educated; and forty years ago she got mad at the witness when she was using her sewing machine. Another's opinion was based upon the fact that she quit speaking to him, for some reason he never knew, after Mrs. Semones married, and because she was peculiar and never went to church. An old neighbor said she did not seem rational; was distant toward her relatives; had separated from her husband one time and "was almost a maniac." Once she had gone to his father's house and fired two shots in it. On the trial of her husband's will case, Mrs. Semones' little child came over and looked in her grandmother's face, and the old lady pushed her away. Another former neighbor, not on speaking terms with her for twelve years, testified that the daughter had done the biggest part of the work at home, and her mother was not kind to her. When Mrs. Semones' first baby was born, he told her father, who responded, "I am better off than I thought I was"; while Mrs. Jackson said, "I hope it will die," and went away talking to herself.

A nephew of Mrs. Jackson, who had not seen her but very little in the past fourteen years, based his opinion of incompetency upon the ground that she seemed peculiar and hated her family. Another witness, who was comparatively a stranger, about ten years ago happened to ask her if she had any children and was told that she had none living; that all had died when they were little.

Z. B. Tucker, a barber, lived in the boarding house for many years and testified to a close friendship with Mrs. Jackson, which continued after he moved away. One time, undisclosed, she referred to a mutual friend as "an old gray headed son of b——," because he had not been down to take her for a ride. She became more infirm physically as she grew older, and during the last two months of her life, when he called sometimes she would recognize him and sometimes not; sometimes she could talk and sometimes not so well. Upon this he based his opinion of mental incapacity.

The Reverend T. H. Bowen, who was Mrs. Jackson's and also Mrs. Semones' pastor, described the testatrix as being eccentric and slightly below the average men-

tally. She had strong prejudices, likes and dislikes; was very fixed and determined in her attitudes, and rather a morbid disposition. He did not regard her as affected with insanity, but simply as not being a normal type of person. Mrs. Jackson was in a state of coma during his pastoral visits the last four or five days of her life. The will bears date of January 21, 1935, and seems to have been written about two weeks before death. The substance and effect of Dr. Bowen's answer, when asked on cross-examination as to his opinion regarding Mrs. Jackson's testamentary capacity, is that she was qualified to make a will.

The only physician introduced by the contestant was Dr. C. B. Van Arsdale. During the illness of her husband, who was being attended by him, Mrs. Semones indicated a desire to see her father. He approached Mrs. Jackson upon the subject, and she said she didn't want her to come because she had not treated them right, and that she didn't want to have anything to do with her. This was about nine years before her death and the doctor had not been in her presence since. In answer to the usual form of question as to his opinion of testamentary capacity, Dr. Van Arsdale answered:

"She seemed so prejudiced toward her daughter I don't think she could consider fairly anything when the daughter was concerned in it."

This is all the evidence introduced in support of the attack upon the will. It is not necessary to recite the evidence of the contestees, but it may be said that many witnesses, including two physicians, who were closely associated with Mrs. Jackson during the fourteen years before her death, testified strongly as to her testamentary capacity, both in relation to mentality and fixedness of purpose to dispose of her property as she did. Mrs. Jackson had executed two other wills after the death of her husband. In both of them she had cut her daughter off with only one dollar, and excepting some minor bequests to other friends, had bequeathed all of her estate to Mrs. Sanders with whom she had lived and who, as the evidence shows without contradiction, had been very kind to her, both in sickness and health. These wills had been prepared by her banker, J. E. Brown, who testified to a clear and sure testamentary capacity. Shortly before the will was executed, Mrs. Jackson had him come to see her and asked him to get her securities

and bring them to her, as she wanted to give her property to Mrs. Sanders. He brought her the safety box and they went over the papers together and discussed what she had. He suggested that she was giving away all of her property, but she expressed the assurance and satisfaction that Mrs. Sanders would continue to take care of her. A little later he was again sent for, and at Mrs. Jackson's request drew up a writing, affirming and certifying the gift to Mrs. Sanders of all of her property in consideration of love and affection, and that she should care for her in the future and pay her funeral expenses.

There is some evidence that at times Mrs. Jackson referred to her daughter in a pleasant way and declared she held no ill will against any one. There is no evidence of any expressions of hatred or lack of affection in later years. Her attitude seems to have been more passive than active.

The power of the owner to dispose of his property after his death is not by natural law, but positive statutory enactment. One of sound and disposing mind, gauged by a familiar standard, may exercise this valuable privilege and transmit his property by will to whomsoever he chooses, and in such manner as he pleases, subject only to a few restrictions, such as the statute against perpetuities or for immoral or illegal purposes. We have long adhered to the doctrine of testatorial absolutism, and have consistently declared that a citizen should not be deprived of this right conferred upon him by law upon slight, remote, and wholly unsubstantial and non-probative testimony. Jurors will not be suffered to make for the testator a will in keeping with what might be their ideas of justness or propriety. Childers' Ex'x v. Cartwright, 136 Ky. 498, 124 S. W. 802; Langford's Ex'r v. Miles, 189 Ky. 515, 225 S. W. 246; Williams v. Davis, 192 Ky. 433, 233 S. W. 886; Mullins v. Mullins, 229 Ky. 103, 16 S. W. (2d) 788; Holden v. Bennett, 243 Ky. 667, 49 S. W. (2d) 568; Duff v. May, 245 Ky. 709, 54 S. W. (2d) 4.

If a will is rational and consistent on its face, the burden rests upon him who questions it to establish want of mental capacity in the maker, or a subjection to such influence as induced him to dispose of his property other than according to his own purpose, or against that intention which he really wills to be performed after

his death. So it is that the instrument often is the best witness for or against itself. Newcomb's Ex'r v. Newcomb, 96 Ky. 120, 27 S. W. 997, 16 Ky. Law Rep. 376; Limbach v. Bolin, 169 Ky. 204, 183 S. W. 495, L. R. A. 1916D, 1059; Moran's Ex'r v. Moran, 248 Ky. 554, 59 S. W. (2d) 7; Bodine v. Bodine, 241 Ky. 706, 44 S. W. (2d) 840.

Mere opportunity to exercise undue influence or dominion over a testator and a suspicion that it was done fall short of proving its exercise as a matter of fact. Wigginton's Ex'r v. Wigginton, 194 Ky. 385, 239 S. W. 455; Burdon v. Burdon's Adm'x, 225 Ky. 480, 9 S. W. (2d) 220; Kidd v. Rodfus, 241 Ky. 133, 43 S. W. (2d) 501; Hanna v. Eiche, 258 Ky. 282, 79 S. W. (2d) 950.

There is not a suggestion in the record of any influence having been brought to bear upon the testatrix to bestow her estate upon the beneficiary named instead of her daughter. The mere fact that she did so could not be regarded as proof that she was wrongfully led to do it. We have often written that gross inequality of disposition, or disinheritance of a child, or a failure to recognize what appears to have been moral obligations, though to be considered as a circumstance, does not standing alone constitute evidence of undue influence justifying the setting aside of a will. Lisle v. Couchman, 146 Ky. 345, 142 S. W. 1023; Egan v. Egan's Ex'r, 189 Ky. 332, 224 S. W. 1050; Burdon v. Burdon's Adm'x, supra.

True, we have also written, as to a will containing irrational and unnatural provisions and apparently unaccountable and grossly inequitable disposition among the natural objects of the testator's bounty, that there must be clear and satisfactory proof of a free, deliberate, and disposing mind before such paper shall be established as a true and valid will. But that rule cannot be applicable here where the will on its face, coupled with proof, showed real and substantial reasons for the disinheritance of a child in favor of one who had been kind and attentive. Cf. Wigginton's Ex'r v. Wigginton, supra.

The facts upon which the witnesses for contestant based their opinions may be said to be her attitude toward her daughter, a high temper, quickness to anger, little education, indifference toward or dislike of her

kinsfolk, and two or three isolated incidents arising from the aversion to her daughter. This factual testimony would seem merely to support Dr. Bowen's appraisement of the testatrix as a highly prejudiced, eccentric, and abnormal person as judged by the ordinary standards of society. Opinions of these laymen as to mental incapacity possess no more probative value than the facts upon which they are founded. Therefore, unless the tangible facts related by such nonexpert witnesses to support their opinions tend to establish unsoundness of mind at the time the will was executed, such opinions are not sufficient to authorize the submission of the question of testamentary capacity to a jury. Davidson's Ex'r v. Melton, 223 Ky. 145, 3 S. W. (2d) 198; Tombragel v. Tombragel's Ex'r & Trustee, 232 Ky. 493, 23 S. W. (2d) 919; Bodine v. Bodine, supra; Dossenbach v. Reidhar's Ex'x, 245 Ky. 449, 53 S. W. (2d) 731, 732. The only witnesses introduced by the contestant who had had any opportunity to observe testatrix within twelve or fourteen years of her death were Dr. Van Arsdale, who nine years before concluded that she was so prejudiced toward her daughter she could not be fair when she was concerned; Tucker, the barber, the nature of whose evidence is of negligible value; and Reverend Mr. Bowen, who expressed the opinion that Mrs. Jackson was mentally qualified to make the will. The evidence fell far short of the requirements. Middleton v. Skaggs, 263 Ky. 81, 91 S. W. (2d) 1016.

As we appraise the evidence, it shows affirmatively a rational knowledge by testatrix of her estate and a fixed purpose to dispose of it according to her own desire. The will but confirmed the gift of her property already made and expressed her reasons for the disposition. There is left in the record only the fact of the mother's hostility, with the consequent diversion of her estate to a stranger in blood. This involves the one factor in the rule of measurement of mental capacity of a knowledge or appreciation of the natural object of her bounty. The law recognizes as an element of capacity the appreciation of paternal or maternal love or instinct and an obligation to bestow one's property upon those bound by such natural ties. Rasdall v. Brush, 104 S. W. 749, 31 Ky. Law Rep. 1138; Frye's Ex'r v. Bennett, 189 Ky. 546, 225 S. W. 499. But it is simply the existence of such duty that the law recognizes. The mere failure to perform that natural obligation can

never be held sufficient to invalidate the bestowal of property upon another. As indicated, it is an important consideration but insufficient in itself. Munday v. Taylor, 70 Ky. (7 Bush) 491; Egan v. Egan's Ex'r, supra. The law does not require that a testator in disposing of his property shall be humane or even just. An unjust will is not necessarily an irrational act, for if one possesses the requisite mental capacity he may make an unreasonable or unjust will and may disinherit his children. "His aversion to his relations is not evidence of insanity, especially where he had reasonable grounds for disliking them." 28 R. C. L. 90.

The appellee relies upon McDonald's Ex'rs v. McDonald, 120 Ky. 211, 212, 85 S. W. 1084, 1085, 27 Ky. Law Rep. 607, 117 Am. St. Rep. 579, in which the court affirmed a judgment setting aside a will where the only evidence tending to support testamentary incapacity was the attitude of a father toward his children. His will gave them equally only a life estate in his property. It is there written:

> "There was much testimony offered by the contestants tending to show that the testator did not know the obligations he owed to his children. He unquestionably had the mind to know his estate, and the nature and value of it. He seems to have had a fixed purpose as to the disposition of his estate, and that purpose was to give his children as little interest in it as possible. The contest was waged upon the ground that his aversion to his children was such that he did not know the obligations he was under to them. It is as necessary, in order to have testamentary capacity, for one to have such sensibilities as will enable him to know the obligations he owes to the natural objects of his bounty, as it is for him to have the capacity to know the nature and value of his estate, and a fixed purpose to dispose of it. Murphy's Ex'r v. Murphy, 65 S. W. 165, 23 Ky. Law Rep. 1460; Wise, etc., v. Foote, etc., 81 Ky. 10 [4 Ky. Law Rep. 643]; Woodford v. Buckner, etc. [111 Ky. 241], 63 S. W. 617, 23 Ky. Law Rep. 627."

The facts of that case show an extreme miserliness and a most extraordinary hatred, accompanied by cruel, inexcusable mistreatment by testator of all his children. It is not suggested that there was any basis for such

vicious and continuing attitude and action throughout the years, and the very violence of the situation manifested the entire absence of natural sensibilities. Such are not the facts here. The mother became estranged from her daughter because of her persistence in a marriage which the mother thought was not wise. The maternal love, weakened by this disobedience, seems to have been almost destroyed by the subsequent contest of her husband's will and certain aspersions cast upon her at that time by the daughter. In the first instance the daughter was doubtless "more sinned against than sinning," and the intolerance and unforgiving attitude of the mother may not be justified. The second instance, whether justifiable or not, naturally caused more bitterness. We must take human nature as it is. On the other hand—without any purpose of balancing the moral or social demands—it cannot be overlooked that there was no attempt by the daughter to be reconciled through the subsequent years, except on two occasions, most inopportune, when her mother was desperately ill. There is evidence that Mrs. Semones discouraged a mutual friend who wanted to try to effect a reconciliation shortly after the trial of her father's will contest. The daughter's mistreatment was no delusion. Cf. Moates v. Rone, 242 Ky. 287, 46 S. W. (2d) 100; Woodruff's Ex'r v. Woodruff, 233 Ky. 744, 26 S. W. (2d) 751.

Such estrangements are not uncommon. Disrespect and disobedience in a child have been regarded as justification of disinheritance from the beginning of the race. Thus—if we may leave the legal for Biblical history and comment—because Esau married women of the Hittites in disregard of the custom of the Israelites forbidding intermarriage with neighboring racial stocks, he incurred the displeasure of Rebecca, his mother. On this account, some would justify her plot to dispossess Esau of his birthright and blessing in favor of his twin brother, Jacob. Genesis 25, 26. Before that, because Ham had showed a lack of respect for his father, Noah willed that he and all his descendants should be the servants of their brethren. Genesis 9:22-25. So the effect of what may be fancifully called the first wills ever made, penalizing disobedient and disrespectful children, continues to this day.

As judged by imperfect human conceptions, it cannot be said that the will was an iniquitous or unnatural

one. There was a rational basis for it. Certainly the facts do not show an absence of natural sensibilities. They place the case in a different class from the Mc-Donald Case. We are of opinion that the evidence was not sufficient to authorize a submission to the jury and that a peremptory instruction to find for the will should have been given.

Judgment reversed.