## Holladay et al. v. Holladay et al.

Jan. 29, 1943.

M. C. Redwine, Rodney Haggard, Thomas A. Waller, Harvey T. Lisle and Allen Prewitt for appellant.

D. L. Pendleton, S. T. Davis and V. W. Bush for appellee.

OPINION OF THE COURT BY JUDGE SIMS—Affirming.

Upon a verdict rendered in the Clark Circuit Court a judgment was entered adjudging that a paper executed by Lewis Holladay was his last will and testament. This appeal is prosecuted from that judgment.

Appellants, who will be referred to as contestants, seek to reverse the judgment because the court erred: 1. In assuming in the instructions the authenticity and due execution of the will; 2. in refusing to instruct on insane delusions; 3. in admitting incompetent evidence; 4. in refusing a new trial because the judge privately communicated with a juror; 5. in refusing a new trial because of false answers made by a juror on his voir dire.

Appellees, who will be referred to as contestees, insist that they were entitled to a peremptory instruction because there was no testimony of testator's mental incapacity, of undue influence, of insane delusions, or that the will was not duly authenticated; and that if the court committed errors of which contestants complain, such were not prejudicial in view of the fact that a verdict should have been directed in favor of the will.

We will first discuss the question of whether or not

contestees were entitled to a directed verdict. Testator, Lewis S. Holladay, was a bachelor, 66 years of age at the time of his death on April 10, 1940. He was survived by a brother, Joe F. Holladay, the sole beneficiary under his will, and three sisters, the contestants Miss Denia Holladay, Mrs. Russie Parrish and Mrs. Ella Harris. Also surviving him was a nephew, Frank H. Lanter, Jr., of Phoenix, Arizona, the son of a deceased sister, but he took no part in the litigation. The value of the estate in round numbers was $30,000.

Lewis Holladay had a college education and made his home on his mother's farm with her and a maiden sister, Miss Denia, until his mother's death in 1929. She was quite old and her death greatly upset him. The testimony for contestants is that Lewis was far from normal mentally years before his mother died, but was much more unstable afterwards. It was testified he shot and killed his pet dog without reason in 1917 or 1918. During electrical storms he would take his seat under a tree, saying it was safer there than in the house. He was afflicted with stomach ulcers and could not sleep at nights and would roam over the premises and farm, and on occasions would stand like a statue in the county road even at midnight, requiring travelers to drive around him. At times he would go to the barn during the night and throw down hay for his stock when it was not in the barn but was out on pasture. He would bathe at night in a pond which was little more than a hog wallow, saying it gave him relief. It was testified that if the least thing went wrong, such as some meat falling down or the spilling of some lard from a bucket, he became so upset that it was necessary to put him to bed to quiet him. Pages could be consumed in reciting the testimony relative to his queer, weird and unnatural actions. There were many suicides and much insanity on both sides of his family, and it appears in the evidence that he threatened to destroy himself.

Opposed to such testimony, twenty-six of his neighbors, friends, business acquaintances and associates testified he was perfectly sane and normal; that he was a good farmer and a successful business man. These twenty-six witnesses made up a cross-section of the community and included people from all walks of life, doctors, bankers, veterinarians, livestock buyers, farmers and shop keepers, practically all of whom had business

or social contacts with him. Upon the written request of his sisters, he and his brother, Joe, were named administrators of his mother's $23,000 estate, which testator wound up practically without assistance from Joe. In 1930, the year he wrote his will, Lewis contracted with his sisters that be would bid $137.50 per acre for his mother's farm of 146 acres if it were sold at public auction; and he carried out his contract and purchased the farm. He raised and sold registered sheep; was the moving spirit in some important and successful litigation in 1929 involving damages to farm lands in the community when a water dam broke. From 1929 to 1933 he served twice on the petit jury and twice on the grand jury; and in the interim between 1927 and 1940 he wrote more than 2,000 checks aggregating $29,000.

It is evident that upon such conflicting testimony the court correctly left to the jury's determination under an appropriate instruction the question of whether or not testator possessed mental capacity sufficient to execute a will. The record shows the evidence is about as conflicting on undue influence as it is on testamentary capacity, and without taking the space to set it out, it will suffice to say that contestants proved Lewis depended upon Joe for everything, and that the latter stated Lewis would do anything he requested of him. On the other hand, the testimony of the contestees shows Lewis was independent and not susceptible to undue influence by Joe or anybody else. Therefore, the court properly submitted this question to the jury in his instructions.

We are not in accord with contestants that the court erred in assuming the authenticity of the will. It was duly proved to be wholly in the handwriting of testator and we are cited to no place in this voluminous record where such proof was contradicted and we have found none. The fact that Joe contradicted himself on the witness stand as to the time and place where he found the will had no bearing on the undisputed testimony that the will was in Lewis' handwriting. During the trial Joe was asked to copy the will as near like the original as he could. The fact that the copy he made bears a slight resemblance to the original will, and that there is some similarity between his and testator's handwriting, do not make an issue on the authenticity of the will.

The court did not err in refusing to give contest-

ants' proffered instruction on the alleged insane delusions Lewis had against his sisters. His feelings toward them were unkind and even bitter, but they were based upon facts and not delusions. His sisters had objected to the fee allowed him as administrator of his mother's estate, although it was slightly less than the statutory limit of 5%. They had insinuated that when he and Joe, the morning after the death of their brother Felix, went through the deceased's personal effects they were looking for his will with the sinister motive of destroying it if they found one in favor of the sisters. Miss Denia had intimated that Lewis had sensual plans in bringing in a housekeeper after his mother's death. Then after Lewis had agreed to bid $137.50 per acre on his mother's farm, his three sisters attempted to raise the price. This combination of incidents had turned Lewis against his sisters, but it cannot be said his feelings were insane delusions, which are ideas or beliefs which spring spontaneously from a diseased or perverted mind without reason or foundation in fact. A belief which is based upon reason and evidence, be it ever so slight, cannot be an insane delusion. Moates v. Rone, 242 Ky. 287, 46 S. W. (2d) 100, and authorities therein; Jackson's Ex'r v. Semones, 266 Ky. 352, 98 S. W. (2d) 505.

Counsel for contestees frankly admit they introduced incompetent testimony when they proved the general reputation of both testator and the beneficiary, since under sec. 599 of the Civil Code of Practice the good character of a witness is not admissible unless his general reputation has been impeached. Testator not being a witness, his reputation was not in issue; and since Joe's reputation was not attacked, the court erred in admitting testimony offered by contestees proving his good reputation. They seek to excuse their error on two grounds: (a) Contestants invited it by first proving the good reputation of Miss Denia; (b) such testimony was not prejudicial. This record is rather large, containing 976 pages of testimony, and while we cannot recall which side first resorted to proving the good reputation of their clients without it first being impeached, we do know both indulged in this character of proof. Therefore, we are not inclined to regard this error as seriously as we would if only one side had brought out such incompetent evidence. Nor do we think the testimony of Joe's good reputation was so prejudicial as to call for a reversal of the judgment as was the testimony of appellees' good reputation

in Northern Assurance Co. v. Griffin, 236 Ky. 296, 33 S. W. (2d) 7, where in a suit to recover on an insurance policy the defense was that Griffin had set fire to the building. There it was held that character had a direct bearing on the issue and it was reversible error to prove Griffin's good reputation before it was attacked. The instant case is more like Hignite v. Nantz, 254 Ky. 214, 71 S. W. (2d) 442, where it was written that the erroneous admission of character evidence had no bearing on the real issue, therefore was not reversible error. Had there been any substantial evidence that Joe forged the will in litigation in the instant case, we would have a different question than the one now confronting us as to whether or not the erroneous admission of character evidence was prejudicial.

Mrs. Harris, a sister of Lewis Holladay, was the second witness for contestants. The court refused to let her testify that a double cousin, Dave Holladay, had committed suicide, being of the opinion it shed no light on the question of Lewis' insanity. Contestants most vigorously complain of this ruling. But in answer to the next question Mrs. Harris testified, without objection, that another double cousin had destroyed herself. Also, her sister Mrs. Parrish, who followed her on the stand, consumed three pages in giving the family history of much insanity and suicide in which she mentioned that Dave was taken to the asylum. Therefore, the contestants could not have been prejudiced by the court momentarily excluding Mrs. Harris' testimony on this point.

There is no merit whatever in contestants' insistence that the trial judge privately communicated with the juror, Kimbrell, as to the meaning of undue influence in the presence of Dr. Snowden in the latter's office. Both Kimbrell and the doctor testified no such thing happened. Contestants attempted to prove by a juror, Thacker, what transpired in the jury room; also that after the verdict Kimbrell told Thacker he had heard the judge tell Dr. Snowden in the latter's office during the noon recess what constituted "indue" influence and based upon that definition Kimbrell changed his mind as to how the verdict should be. We have many times written that the testimony of jurors is not admissible to impeach their verdict. Irvine v. Greenway, 220 Ky. 388, 295 S. W. 445. Kimbrell denied the conversation Thacker

related as occurring between them. Be that as it may, as a juror's testimony is not competent to impeach the verdict, certainly hearsay testimony as to what the juror told another is not competent for that purpose. Dunbar v. Com., 192 Ky. 263, 232 S. W. 655.

Contestants insist they are entitled to a new trial because a juror, Owen Sams, did not truthfully answer questions on his voir dire. This was a long trial, lasting about two weeks and while all the evidence was reported, counsel did not see fit to have the voir dire of the jury reported, hence we must rely upon affidavits appearing in the record as to what questions were asked jurors and their answers thereto. The general question was asked the panel of eighteen if they knew of any reason why they could not give both sides a fair and impartial trial according to the law and evidence. None of the jurors answered that question. After several jurors had been excused, Sams was then called and examined separately as the eighteenth member of the panel. He states in his affidavit that he was not prejudiced for or against either side and tried the case according to the law and evidence; that the question was not asked him whether or not he was acquainted with testator; and had it been asked, he would have answered that he had a slight acquaintance with him while helping his father build a barn for testator in 1923. Many affidavits were filed of various jurors but none of them state that Sams was asked the question whether or not he knew testator—but only that the general question was asked the panel if they could fairly and impartially try the case under the law and evidence.

It is only in clear cases that a new trial will be granted on account of a juror giving false information on his voir dire, and where the evidence is equiponderant on the subject we will not disturb the ruling of the trial court. Schreiber v. Roser, 258 Ky. 340, 80 S. W. (2d) 1. But in the instant case the affidavits of the various jurors do not state that any false information was given by Sams on his voir dire, and clearly contestants cannot take advantage of the fact that he knew testator when he was not asked that question. Trent v. Chesapeake & O. R. Co., 221 Ky. 622, 299 S. W. 556. Since Sams gave no false information on his voir dire, what was written in Drury v. Franke, 247 Ky. 758, 57 S. W. (2d) 969, 88 A. L. R. 917, and Olympic Realty Co. v. Kamer, 283 Ky. 432, 141 S. W. (2d) 293, that a new trial may be granted.

where a juror gives erroneous information on his voir dire to pertinent questions and it was relied upon, does not apply.

The judgment is affirmed.